## NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2023 CJ 0825

STATE OF LOUISIANA
IN THE INTEREST OF
A.C. AND R.C.

Judgment Rendered: __JAN 1 9 2024__

* * * * *

On Appeal from the
Twenty-Second Judicial District Court
In and for the Parish of Washington
State of Louisiana
No. J-21-161

The Honorable Scott Gardner, Judge Presiding

* * * * *

| | |
|---|---|
| John T. Thomas<br>Franklinton, Louisiana<br>Jane Hogan<br>Louisiana Public Defender Board,<br>Child in Need of Care Appellate Project<br>Hammond, Louisiana | Attorneys for Appellant<br>C.C. - Mother |
| Rebecca F. Henderson<br>Mental Health Advocacy<br>Service/Children's Advocacy Program<br>Mandeville, Louisiana | Attorney for Appellee<br>A.C. and R.C. - Minor Children |
| J. Collin Sims<br>District Attorney (Interim)<br>Covington, Louisiana | Attorney for Appellee<br>State of Louisiana |
| Kimberly E. DeBrock<br>Covington, Louisiana | Attorney for Appellee<br>State of Louisiana,<br>Department of Children and Family<br>Services |
| Linda S. Stadler<br>Madisonville, Louisiana | Attorney for Appellee<br>R.W. - Father |

* * * * *

**BEFORE: WELCH, HOLDRIDGE,[1] AND WOLFE, JJ.**

---

[1] The Honorable Guy Holdridge, retired, is serving as judge *pro tempore* by special appointment of the Louisiana Supreme Court.

Welch J. concurs without reasons

Wolfe, J. concurs

**HOLDRIDGE, J.**

This appeal is taken from judgments of the district court rejecting the case plan goal of reunification of two minor children with their mother, as recommended by the Department of Children and Family Services for the State of Louisiana (DCFS). For the reasons that follow, we vacate the judgments and remand this matter.

## FACTS AND PROCEDURAL HISTORY

C.C. and R.W. are the biological parents of A.C., born on May 21, 2020, and R.C., born on December 14, 2021 (the children).[2] On December 16, 2021, DCFS received a report of a drug-affected newborn and alleged neglect. According to the report, when R.C. was born, he and his mother, C.C., both tested positive for amphetamines and THC (marijuana). Based on the report, a DCFS employee, Shannon Dyson, began an investigation. C.C. admitted to using marijuana daily throughout the pregnancy and initially denied, but later admitted, using amphetamines. At that time, C.C.'s seventeen-month old daughter, A.C., was living with her in the home. According to the report, C.C. did not have prenatal care, and she failed to make a newborn doctor appointment for R.C., despite his appearing to be jaundiced. C.C. told the DCFS worker that she was going to make an appointment but had just received her SNAP benefits and wanted to buy food instead. C.C., who had been diagnosed as bipolar, was not in treatment or on medication at that time. C.C. initially went to her father's home with the children after giving birth to R.C., but then she went to R.W.'s home with the children. R.W. admitted that he smoked marijuana.

Consequently, on December 20, 2021, DCFS sought and was issued an oral instanter order pursuant to La. Ch.C. art. 606(A), removing the children from the

---

[2] The initials of the minor children, parents, and certain other adults will be used in this opinion to protect the privacy of the parties involved. See Uniform Rules – Courts of Appeal, Rules 5-1 and 5-2.

2

parents due to the abuse and neglect allegations and placing them in DCFS's temporary custody. The oral order was confirmed in an Instanter Order for Removal and Provisional Custody to DCFS on December 21, 2021.[3]

On January 2, 2022, the District Attorney filed a Child in Need of Care Petition with Custody alleging that the children were in need of care under La. Ch.C. art. 606(A)(1) (abuse) and (2) (neglect).[4] The Child in Need of Care petition stated that DCFS believed that, due to C.C.'s substance abuse, instability, and untreated mental health issues, along with R.W.'s daily use of marijuana and lack of safe stable housing, the children would be at an unreasonable risk of harm if left in their care. At an answer hearing held on February 10, 2022, a plea was entered on behalf of C.C. and R.W. denying the allegations in the Child in Need of Care petition. According to the minute entry, the district court found that the current placement was the most appropriate and that reunification was the case plan goal. At that time, the children had been living with T.H. and C.H., C.C.'s father and stepmother.

On March 3, 2022, the district court held a hearing where the children were adjudicated children in need of care pursuant to La. Ch.C. art. 606(A)(2) after the parties so stipulated without admitting to the specific allegations of the petition.

---

[3] A continued custody hearing was held on December 28, 2021, and all parties stipulated to DCFS's recommendation that the children were in need of care and that continued custody in the current placement was appropriate. The district court signed a Continued Custody Order on January 4, 2022, continuing the DCFS custody of the children, and the order stated that T.H. and C.H., C.C.'s father and stepmother, were caring for them.

[4] Louisiana Children's Code article 606(A)(1) and (2) provides the following:

> A. Allegations that a child is in need of care shall assert one or more of the following grounds:
> (1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
> (2) The child is a victim of neglect.

3

The district court signed an Adjudication Order and a Judgment of Disposition on March 18, 2022, and in the latter, it approved DCFS's case plan and the permanent case plan with the goal of reunifying the children with their parents.[5] The district court signed an order on March 4, 2022, maintaining the DCFS placement.

A six-month case review hearing was held on June 2, 2022, after which the district court signed a Case Review Order that maintained the children in DCFS custody, in their current placement, and approved the case plan submitted by DCFS. According to the minute entry from that date, reunification was the case plan goal.

A twelve-month initial permanency hearing was held on January 6, 2023. See La. Ch.C. art. 702(B). Ms. Dyson, C.H., and S.A. (C.C.'s mother) testified. Ms. Dyson testified that she had been the caseworker throughout this matter. According to Ms. Dyson, C.C.'s hair and urine drug screens on December 21, 2022, were both negative, and C.C. had not tested positive for drugs since she completed drug treatment at a local hospital. Ms. Dyson testified that after completing drug treatment, C.C. had received treatment for her bipolar disorder and medication management from a local hospital. According to Ms. Dyson, C.C. reported to her that she no longer had contact with R.W., who had been incarcerated.

Ms. Dyson testified that C.C. had a home that was acceptable for the children to return to. According to Ms. Dyson, C.C. lived in the duplex that her grandfather owned. C.C.'s grandfather also lived in the duplex, but they each had their own full living quarters with a kitchen and bathroom. Ms. Dyson said that C.C. did not pay rent. Ms. Dyson stated that C.C. was employed. According to

---

[5] The Judgment of Disposition also stated that DCFS attempted to work with the family and "conducted a safety plan with [C.C.] and [T.H. and C.H.][,] but [C.C.] ultimately broke the safety plan. The parents admit to using illegal drugs and not having a safe, stable living environment for the children."

4

Ms. Dyson, C.C. had her own transportation and a valid driver's license. Ms. Dyson testified that C.C. intended to keep the children enrolled in their current daycare and also intended for her mother, S.A., to assist with childcare. Ms. Dyson testified that S.A. lived on the same property as C.C. in a camper.

Before November of 2022, C.C. had weekly three-hour visits with the children at T. H. and C.H.'s home. Ms. Dyson testified that at the end of November of 2022, C.C. began having unsupervised visits with the children on Saturdays from 8 a.m. to 5 p.m. Ms. Dyson also testified that C.C.'s visits with the children were sporadic during the first six months they were in T.H. and C.H.'s custody, but C.C. began visiting the children regularly after being released from treatment. Ms. Dyson testified that C.C. had a twelve-year old daughter from a prior marriage who also visited her.

Ms. Dyson testified that other than the completion of a required parenting class, C.C. was in substantial compliance with the remainder of the plan. Ms. Dyson testified that C.C.'s failure to complete the parenting class was "not necessarily her fault," as the facility teaching the parenting class failed to send Ms. Dyson a link to register C.C. Ms. Dyson reapplied for C.C. to be admitted into a parenting class in January of 2023. Ms. Dyson further testified, "I don't have any concerns about anything when it comes to [C.C.]."

C.H. testified that C.C. had visited the children regularly, but left early on occasion and did not ask for extra time. According to C.H., R.C. was hospitalized for adenovirus at two months old and for RSV at five months old, but C.C. did not visit him at the hospital despite C.H.'s texts informing her of his hospitalization. C.H. also testified that C.C. had not accompanied them to any of the children's medical appointments, and, on occasions when the children were sick, such as when the children had COVID, C.C. did not visit them. C.H. testified that C.C. did not call regularly to check on the children, but she did contact C.H. and T.H. on

5

visitation days. According to C.H., C.C. did not have a good relationship with S.A., so she and T.H. were concerned about her assistance with the children's care.

When S.A. testified at the hearing, she indicated that there was a time period when C.C. left her home that she and C.C. did not have any communication, but S.A. stated that there never was a time when they had a bad relationship.

At the conclusion of the hearing, the district court stated:

> I've reviewed the Civil Code (sic) ... for the factors in determining the [children's] best interest. I've also reflected on the reasons why we have a permanency hearing at 12 months. I've also reflected back on the principles of attachment in which we learn, which are more important with young children than many have thought, as little as 10 years ago.

The court then stated, "Based upon the need for permanence of the children, at this time, I decline to approve the case plan." The court then gave DCFS thirty days to "re-confect" a new plan.

The Permanency Hearing Order signed by the district court on January 31, 2023, reflected the court's rulings declining to approve the DCFS case plan and ordering DCFS to prepare and submit to the district court for approval a new case plan within thirty days. In the Order, the district court also ordered no change in the visitation schedule or the children's placement without notice.

On February 3, 2023, C.C. filed an objection to DCFS's new case plan's recommended goal of "ASFA" and requirement that she complete parenting classes.[6] C.C. alleged that her failure to complete parenting classes was not due to "any deficiency from" her and that she otherwise had substantially completed other

---

[6] The ASFA exception refers to the Adoption and Safe Families Act of 1997, pursuant to which states are mandated to establish "permanency plans" for children within the foster care system. The Act provides that such plans must demonstrate, among other things, that the State make reasonable efforts to "preserve and reunify" the family. If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. **State in Interest of I.K.**, 2022-0927 (La. App. 1 Cir. 12/22/22), 358 So.3d 56, 60 n.2, writ denied, 2023-00089 (La. 3/7/23), 357 So.3d 349.

aspects of and complied with her case plan. She sought immediate reunification and the return of her children.

The next permanency review hearing was held on February 23, 2023. At the hearing, the district court heard argument, then at the court's invitation, the parties stipulated as to the "previous testimony as germane and relevant in all parts to this review" and agreed that new testimony would pertain to events occurring after the prior hearing on January 6, 2023. S.A., C.C., and Ms. Dyson testified.

Ms. Dyson testified that since the January 6, 2023 hearing, she had observed C.C.'s unsupervised Saturday visits with her children three times. Ms. Dyson testified about C.C. playing with, feeding, and putting the children to sleep. Ms. Dyson indicated that C.C. met her children's needs and that she "kept a close eye on the children," such that Ms. Dyson was not concerned for the children's safety. According to Ms. Dyson, she did not have to correct C.C. with anything or redirect her, and the children had their own space and beds in the home that they seemed familiar with. At one of the visits, Ms. Dyson met C.C.'s older daughter from a previous relationship and stated that she was well-mannered, behaved appropriately with the children, and assisted C.C. with them. Ms. Dyson also indicated C.C. was "very compliant" about her mental health treatment and that she had continued to test negative for drugs.[7] Ms. Dyson testified that C.C. had begun her parenting class and had performed well in it, according to the instructor. Ms. Dyson stated that the parenting class was scheduled to end on March 1, 2023, and the parenting class instructor wished to observe the children in C.C.'s home on the March 1, 2023 visit. The instructor indicated to Ms. Dyson that C.C. had

---

[7] Ms. Dyson was asked about S.A. working at the same hospital where C.C. sought treatment for her mental illness. Ms. Dyson answered that she was not worried about a conflict of interest because S.A. did not work in the mental health branch of the hospital. Later S.A. testified that she worked in the administration department at the hospital and did not have access to any of C.C.'s mental health records.

7

acknowledged the reason the children came into custody (her mental health and substance abuse issues, as well as the mistakes she made with R.W.). Ms. Dyson wanted to increase C.C.'s visitations so the children could be transitioned into her care.

C.C. testified that since the prior hearing, as part of her mental health and substance abuse treatment, she took a drug test and her results were negative. She testified that she had one parenting class left on March 1, 2023. C.C. testified about her job and her plan to continue the children's schedules and attendance at their day care, with S.A. bringing them and C.C. picking them up. C.C. indicated that pickup from T.H. and C.H. for her visitation with the children went well because they were excited to see her, but drop-offs were difficult because A.C. did not want to leave C.C. According to C.C., she was working with her parenting class instructor on routines to make the process easier. C.C. stated that she understood that, especially for R.C., T.H. and C.H. were his "main source of bonding," and she did not want to take the children away from T.H. and C.H. completely because she knew that would be difficult for them and could cause trauma to the children.

At the conclusion of the hearing, the district court rejected the DCFS case plan and ordered DCFS to revise it. In support of its ruling, the district court stated, in part:

> [DCFS] chose [T.H. and C.H.], rather than any other place, as the only place that these children could be safely maintained for the last fourteen months. In light of their age; their previous instability; the fact that [DCFS] is not recommending immediate reunification at this moment; the fact that there has not been presented a clear and consistent plan for care, causes me to have to seriously consider whether or not permanency planning has been meaningfully and intentionally prepared for during the last fourteen months. It also puts the Court in the unfortunate decision [sic] of having to review Children's Code Article 712 [(sanctions imposed on DCFS for failing to comply with permanency requirements)], as well as other remedies, that may be available for the children.

8

I have a very real concern that these children may be handicapped by permanent attachment problems, further damaging their prospects after such a start to life as they have had.

The Permanency Hearing Order signed on February 26, 2023, after the hearing, contained an inconsistency. Under the section entitled "[PERMANENT] PLAN RULINGS AND FINDINGS," the box was checked stating that the permanent plan for the children that was the most appropriate and in their best interest was reunification, and "Reunification" was typed in the blank space. However, the Order later stated that the January 30, 2023 DCFS case plan was not approved as it was not consistent with the health and safety of the children and in their best interest.

Meanwhile, following the February 23, 2023 hearing, C.C. filed a notice of intent to seek supervisory review of the court's ruling at the hearing rejecting the reunification case plan. C.C. then filed a motion to extend the return date in order to obtain a transcript of the hearing, which was granted. She also sought a stay of the district court's ruling, which was denied.

On March 6, 2023, DCFS submitted a Court Report and case plan that recommended reunification and that custody be returned to C.C. with continued DCFS services.[8] On March 9, 2023, the children's counsel filed an opposition to the DCFS January 30, 2023 case plan and the DCFS recommendations in the March 6, 2023 Court Report.

At the third permanency review hearing on March 10, 2023,[9] DCFS initially noted that there was no new evidence that could be adduced from additional

---

[8] The report was consistent with the testimony adduced at the prior hearings. Attached to the report were nine different drug testing results from different dates where C.C. tested negative. The case plan following the report reiterated that C.C. was subject to random drug testing, that she was expected to utilize a support system if her children were returned consisting of her mother, T.H., and C.H., and that she would facilitate visitation between the children and T.H. and C.H.

[9] The hearing transcript in the record bears the date of March 9, 2023, but the Permanency Hearing Order and minute entry give the date as March 10, 2023.

9

testimony, and all parties stipulated to the contents of the DCFS report; however, the children's counsel objected to the goal of reunification. The district court again rejected the DCFS case plan of reunification over the objections of C.C. and issued the following ruling:

> In terms of permanency planning, I make no findings against [DCFS], in terms of their good faith efforts to achieve permanency. Therefore, I'm not considering sanctions, and I'm not considering the other matters of ordering that no funding take place, or any other matters. I believe that [DCFS], in good faith, has participated in permanency planning for the children. I do make an overwhelming finding of fact, that removing these young children from a safe and stable environment, would be disastrous.
>
> Not only would it not be in their best interest, it would present the real possibility of long-term damage to them that could not be mitigated in any way. It's also of note that at permanency there was no recommendation that the children be reunified, because of a consensus belief that [C.C.] was not in a position to care for the children and be reunified at that time. And then, that these three months delays, where we are now at 15 months or greater, have only reaffirmed the bonds between the children and the only parents that they have known.
>
> In terms of permanency planning, this Court finds that the goal of adoption is in the children's best interest for their safety and well-being. I order that the [DCFS] will provide a case plan consistent with adoption. I find that the current placement with their maternal grandparents is the most appropriate, least restrictive, and most family-like setting to meet their current needs.
>
> I order that visitation will be consistent with the goal of adoption and that services provided to the children will be services provided to facilitate their adoption. I order no change in placement absent written notice to the Court and counsel. And I'll refrain from ordering the filing of a petition to terminate parental rights for the time being. However, if one is filed by any party, I'll promptly consider that.

C.C. and DCFS objected to the court's ruling.

On March 30, 2023, the district court signed a Permanency Hearing Order reflecting its rulings from the hearing. Specifically as to the case plan, the order states:

> THE COURT ... ORDERS that the permanent plan for the children ... that is the most appropriate and in the best interest of the children in accordance with the priorities of placement in Article 702(C) is the following: Goal is **Reunification. However, the court has rejected 3 recent Case Plans with a reunification goal finding that**

10

**reunification would not be in the best interest of the children at this time.**

The court ordered DCFS to prepare a case plan consistent with the goal of adoption. The written judgment also set a case review for April 20, 2023.

Meanwhile, on March 10, 2023, C.C. filed a notice of intent to seek writs from the district court's ruling on March 10, 2023, rejecting the DCFS case plan with its goal of immediate reunification and ordering that the goal be adoption. C.C. filed a motion to consolidate the prior writ application from the February 23, 2023 ruling with this writ application that the district court granted on March 10, 2023. On April 14, 2023, this Court granted the writs as to the February 23, 2023 and March 10, 2023 judgments, stating that the judgments were appealable, citing La. Ch.C. arts. 700(C) and 710(D).[10] **State of Louisiana in the Interest of A.C. and R.C.**, 2023-0283 (La. App. 1 Cir. 4/6/23) (unpublished writ action). The matter was remanded with instructions for C.C. to submit an order of appeal within fifteen days of this court's order, should she choose to appeal.

On April 12, 2023, DCFS filed a Motion and Order to Correct the Judgment to Conform with Court's Oral Ruling as to the March 30, 2023 Permanency Hearing Order. DCFS alleged that the judgment did not reflect the court's oral rulings that rejected the reunification plan and sought to have the judgment amended to conform to the court's oral ruling. The district court set the matter for hearing on April 20, 2023. The April 20, 2023 minute entry reflects that the district court granted DCFS's motion. The district court signed an Amended Permanency Hearing Order on the same date. The Amended Permanency Hearing

---

[10] Louisiana Children's Code article 700(C) concerning case review hearings provides, in pertinent part: "Any person directly affected may appeal the findings or orders of the court rendered pursuant to this Article." Likewise, La. Ch.C. art. 710(D) concerning permanency hearings provides, in pertinent part, that "[a]ny person directly affected may appeal the findings or orders of the court rendered pursuant to this Article."

11

Order deleted all of the language under "[PERMANENT] PLAN RULINGS AND FINDINGS" regarding reunification as the permanent plan and substituted "**Adoption**" in its place. Under "**FURTHER ORDERS AND FINDINGS**," the language was modified to state that the current placement with the maternal grandparents was "**the most appropriate, least restrictive, and most family-like setting to meet [A.C. and R.C.'s] current needs. Visitation will be consistent with the goal of adoption**."

Pursuant to this court's writ action, C.C. timely filed her motion and order for appeal on April 21, 2023, of the February 26, 2023 and March 10, 2023 rulings, which the district court granted. Thus, the February 26, 2023 Permanency Hearing Order (reflecting the February 26, 2023 ruling) and the March 30, 2023 Permanency Hearing Order, as amended by the April 20, 2023 Amended Permanency Hearing Order (reflecting the March 10, 2023 ruling), are properly before the court in this appeal.

## DISCUSSION

### Statutory Overview

Whenever custody of a child is assigned to DCFS as a child in need of care, there are two separate components of permanency planning: (1) the initial case plan (La Ch.C. arts. 671 to 677 (Chapter 13)) and its review hearing process; and (2) the identification of a permanent plan for the child and its review hearing process (La. Ch.C. arts. 701 to 711 (Chapter 16)).[11] See **State in Interest of C.M.**, 2017-0429 (La. App. 1 Cir. 5/31/17), 2017 WL 2384881, *3 (unpublished). This

---

[11] Louisiana Children's Code article 671 provides that if at any point in a child in need of care proceeding, a child enters the custody of a child care agency (defined by La. Ch.C. art. 603(7) as "any public or private agency exercising custody of a child"), the provisions of Chapter 13 as to permanency planning reports govern. Similarly, La. Ch.C. art. 687 provides that if at any point in child in need of care proceedings, the child is removed from his parent's care and control and placed in the custody of DCFS, the provisions of Chapter 15 as to dispositional reviews shall govern the subsequent review process until such time as the child achieves a permanent placement as defined in La. Ch.C. art. 603(22). Likewise, La. Ch.C. art. 701 provides that the provisions of Chapter 16 are applicable to the review process.

12

case review and dispositional review process continues until the child achieves the proposed permanent plan. La. Ch.C. Chapter 15, Authors' Notes. Nonetheless, an assignment of legal custody to DCFS, regardless of the stage of the proceedings, confers to DCFS the exclusive authority to determine a particular placement of a child. La. Ch.C. art. 672, Official Comments, 2001.

Louisiana Children's Code article 700, which was intended to clarify the role of the court *vis-à-vis* the role of DCFS as set forth in La. Ch.C. art. 672 (see La. Ch.C. art. 700, Official Comments, 1991), provides as follows:

A. At the conclusion of the case review hearing, the court shall make a finding as to whether the child can safely return to the custody of the parent and shall order return of custody to the parent if it is safe to do so. The court order shall give specific written reasons for the findings. If the court finds that the child cannot be safely returned to the parent under terms and conditions deemed to be in the best interest of the child, the court may take one of the following actions:
(1) Approve the plan as consistent with the health, welfare, and safety of the child and order compliance by all parties.
(2) Find that the case plan is not appropriate, in whole or in part, based on the evidence presented at the contradictory hearing, and order the department to revise the case plan accordingly.

Louisiana Children's Code article 702 concerns permanency hearings and provides, in pertinent part, as follows:

B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.
C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
(1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent shall be in compliance with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
(2) Adoption.
(3) Placement with a legal guardian.

(4) Placement in the legal custody of a *suitable relative who is* willing and able to offer a stable and safe home for the child.

(5)(a) Placement in the least restrictive, most family-like alternative permanent living arrangement. The department shall document in the child's case plan and its report to the court the compelling reason for recommending this plan over the preceding higher priority alternatives.

(b) The permanent plan provided for in this Paragraph may be considered only if the child is sixteen years of age or older.

\* \* \*

E. Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts, as defined in Article 603, to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the permanent plan. The health, welfare, and safety of the child shall be the paramount concern in the court's determination of the permanent plan.

\* \* \*

G. When reunification is determined to be the permanent plan for the child, the court shall advise the parents that it is their obligation to achieve the case plan goals and correct the conditions that require the child to be in care within the time period specified by the court. Otherwise, an alternative permanent plan for the child shall be selected and a petition to terminate parental rights may be filed. When adoption is the permanent plan for the child, the court shall advise the parent of the authority to voluntarily surrender the child and to consent to the adoption prior to the filing of a petition to terminate parental rights.

### Issues Presented for Review

On appeal, C.C. contends that the district court committed legal error when it repeatedly rejected DCFS's requests to maintain the goal of reunification and when it ordered DCFS to change the permanency goal to adoption. C.C. also contends that the district court abused its discretion in its judgments, violating her constitutional rights to the custody and care of her children and to a fundamentally fair proceeding, citing **Lassiter v. Department of Social Services of Durham County, N.C.,** 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). DCFS filed a brief in this Court stating that it supported C.C.'s contentions. Counsel for the

14

children contends on appeal that the district court did not err in ordering DCFS to change the case plan goal to adoption.

C.C. contends that La. Ch.C. art. 700(A)(2) permits the court to reject a case plan if it finds the plan is "not appropriate . . . based on the evidence presented at the contradictory hearing." In this case, the district court rejected three case plans recommending reunification, primarily based on the length of time the children had been in their current placement and their need for permanency. C.C. argues, however, that the mere length of time that a child has been in the State's custody, alone, does not form a legal basis for either changing the goal to adoption or for terminating parental rights. See La. Ch.C. art. 702(B) and (C)(1) (providing a permanency hearing shall happen within one year of a child's removal and that reunification may remain the permanent plan if the parent is complying with the case plan and making "significant measurable progress"); La. Ch.C. art. 1015(5) (providing grounds for termination of parental rights if the child has been in the State's custody for more than one year and "there has been no substantial parental compliance with a case plan for services which has been previously filed by [DCFS] and approved by the court as necessary for the safe return of the child.")[12]

C.C. complains that the district court has failed to recognize her significant, measurable progress, and instead ordered DCFS to move toward adoption despite a lack of statutory grounds to support a judgment of termination. C.C. argues the district court exceeded its authority by repeatedly rejecting DCFS's case plan, which she contends had the effect of improperly dictating the permanent placement of the children in their current placement with T.H. and C.H, relying on **State in the Interest of Z.U.**, 20-26 (La. App. 5 Cir. 5/13/20), 296 So.3d 1122, 1133, writ denied, 2020-00574 (La. 6/10/20), 307 So.3d 1031, and **State in Interest of C.M.**,

---

[12] Louisiana Children's Code article 1015(6) was renumbered to article 1015(5) by 2023 La. Acts No. 271, § 1.

2017 WL 2384881 at *5. She contends that the perceived best interest of the children remaining with their current placement would be insufficient to terminate her parental rights, as the Louisiana Children's Code mandates that a statutory ground for termination must exist before courts weigh the best interests of the children, citing La. Ch.C. arts. 1015 and 1037.

C.C. also argues the district court erred when it changed the permanency goal to adoption because it ignored the priority of placement in La. Ch.C. art. 702(C), which is provided in addition to the provision that the district court shall determine the permanent plan for the child that is "most appropriate and in the best interest of the child." The priority of placement set forth in La. Ch.C. art. 702(C)(1) gives a return to the parents as the first option "within a specified time period consistent with the child's age and need for a safe and permanent home." Louisiana Children's Code article 702(C)(1) further provides that "for reunification to remain as the permanent plan for the child, the parent shall be in compliance with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care." Louisiana Children's Code article 702(C)(2), (3), and (4) then provides for adoption, placement with a legal guardian, and lastly, placement in the legal custody of a suitable relative who is willing and able to offer a stable and safe home for the child. C.C. argues that the Children's Code goal mandates that reunification be prioritized as the permanency goal because she was in full compliance with her case plan, has made significant progress, and exhibits no safety concerns.

C.C. contends the district court's refusal to honor DCFS's repeated requests to increase visitation and the court's clear directive that termination should "promptly" be considered also violates her rights to a fundamentally fair procedure, citing **State ex rel. D.D.**, 2004-1449 (La. App. 4 Cir. 2/25/05), 898 So.2d 542, 544. C.C. argues that the State's interest in securing permanency for

children arises only "when it is *clear* that the natural parent cannot or will not provide a normal family home for the child," citing **Santosky v. Kramer**, 455 U.S. 745, 767, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599 (1982).

An appellate court's review of a district court's factual findings is governed by the manifest error standard. Under this standard, the appellate court must not substitute its own opinion for that of the district court, which is in the unique position to see and hear the witnesses as they testify. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as those of the district court. If the district court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even though convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. However, when a legal error interdicts the fact-finding process, the manifest error standard no longer applies. **State in Interest of C.M.**, 2017 WL 2384881 at *4.

In reviewing the district court's rulings and C.C.'s contentions on appeal, we find that the district court did not exceed its authority by effectively ordering a specific placement with its rejection of the plan by as C.C. contends. Simply because the result of the district court's order was that the children remained in their existing placement does not mean that the court had actually ordered a specific placement. The court also did not err in considering the best interest of the children because La. Ch.C. art. 702(C) states that the court "shall determine the permanent plan ... that is most appropriate and in the best interest of the child." However, the district court did err in failing to consider the requirements of La. Ch.C. art. 702(C)(1), which states that the court's consideration of the permanent plan is to be made "in accordance with the following priorities of placement," of which the first is returning the child to the legal custody of the parents within a

17

specified time period consistent with the child's age and need for a safe and permanent home. For reunification to remain as the permanent plan, "the parent shall be in compliance with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care." La. Ch.C. art. 702(C)(1).

Here, the district court made the following specific factual findings at the hearings: that the children were with T.H. and C.H. for over a year; their young age; "their previous instability"; that DCFS was not recommending immediate reunification; and that "there has not been presented a clear and consistent plan for care." Other than the district court's finding that it had not been presented with "a clear and consistent plan for care," the remaining findings are not in dispute. However, the district court did not consider C.C.'s compliance with her case plan and the significant measurable progress she had made toward achieving its goals and correcting the conditions requiring the children to be in care as set forth in La. Ch.C. art. 702(C)(1). DCFS has recommended a goal of reunification from the beginning of this case, which the court initially approved, then rejected three different times. Based on the testimony at the hearings, C.C. had made significant progress insofar as she had attended rehabilitation therapy, had not tested positive for drugs or alcohol since completing rehabilitation therapy, was being treated for her mental health issues, had a bond with the children, had obtained a job and housing, and had a plan for continuing the children in daycare and otherwise providing care. The DCFS caseworker who had observed C.C. and the children and had managed the case from its start had no safety concerns about the children being with C.C. We note that although the district court rejected DCFS's case plan goal of reunification, it also specifically stated it was not ordering a petition for termination of parental rights to be filed. Based on the evidence before the district court, we cannot say that it manifestly erred in its factual determinations, but we

18

also find that it erred in failing to consider C.C.'s significant and substantial reformation of her behavior and substantial compliance with the case plan as required by La. Ch.C. art. 702(C)(1).

Under the particular facts of this case, DCFS has continually recommended reunification, and the mother has exhibited a significant, substantial indication of reformation. Therefore, the district court erred in rejecting DCFS's requests to maintain the goal of reunification and in ordering DCFS to change the permanency goal to adoption. While the district court must act in the best interest of the child, to not allow a plan of reunification would violate C.C.'s fundamental constitution right to the custody and care of her children. See **State in Interest of M.O.**, 2019-0130 (La. App. 1 Cir. 7/30/19), 2019 WL 3422685, *3, citing **State ex rel L.B. v. G.B.B.**, 2002-1715 (La. 12/4/02), 831 So.2d 918, 921 ("Parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children, warranting great deference and vigilant protection under the law.") Therefore, we vacate the district court's judgments that rejected DCFS's requests to maintain the goal of reunification and ordered DCFS to change the permanency goal to adoption. Recognizing the time that has passed during the pendency of this appeal, during which the factual circumstances of the mother and children may have changed, we make no ruling as to the appropriate case plan goal going forward. Rather, we remand this matter to the district court for further proceedings consistent with the views expressed herein, including the approval of a new case plan.

## CONCLUSION

For the foregoing reasons, we vacate the district court's February 26, 2023 Permanency Hearing Order (reflecting the February 26, 2023 ruling) and the March 30, 2023 Permanency Hearing Order, as amended by the April 20, 2023 Amended Permanency Hearing Order (reflecting the March 10, 2023 ruling),

19

respectively, and remand this matter for all necessary proceedings consistent with this opinion.[13] Costs of this appeal in the amount of $2,410 to be equally divided among C.C., State of Louisiana, Department of Children and Family Services, and the children, A.C. and R.C.

**VACATED AND REMANDED.**

---

[13] We note that on remand the district court could order DCFS to prepare a case plan including the concurrent goal of reunification with the goal of adoption.